OPINION
{¶ 1} Appellants, Wayne Parker and Kenneth Konopinski ("Parker and Konopinski"), joined as plaintiffs in a suit against appellees, Protective Life Insurance Company of Ohio ("Protective") and Klaben Family Dodge ("Klaben"). Parker and Konopinski alleged various theories of liability against Protective and Klaben stemming from the sale and issuance of disability insurance coverage to them in April 2000. The disability coverage was issued to them in connection with automobile leases they entered into through Klaben.
 {¶ 2} Klaben is an automobile dealership in Kent, Ohio. During April 2000, Parker and Konopinski were customers of Klaben who leased automobiles through the dealership. During the leasing process, they purchased credit disability insurance issued by Protective, an insurance company that regularly issues such coverage.
 {¶ 3} Protective is a corporation duly authorized and licensed to conduct the business of credit insurance throughout the state of Ohio. The credit disability insurance purchased by Parker and Konopinski was issued by Protective.
 {¶ 4} When Parker and Konopinski became disabled after April, 2000, their claims were rejected due to preexisting conditions.
 {¶ 5} Parker and Konopinski filed suit against Protective and Klaben. The claims against Klaben alleged professional negligence, breach of contract, fraudulent misrepresentation, and liability based on negligence. The claim against Protective was based on an agency theory of respondeat superior. Their original suit was voluntarily dismissed in 2003. They refiled the same suit in 2004.
 {¶ 6} Klaben and Protective each filed motions for summary judgment. The trial court entered summary judgments in favor of Klaben and Protective, and Parker and Konopinski timely appealed to this court from such judgments. Our decision is to reverse the trial court's entries of summary judgment and remand this matter to the trial court.
 {¶ 7} The first assignment of error of Parker and Konopinski is as follows:
 {¶ 8} "The Trial Court erred in granting Defendant-Appellee KLABEN'S Motion for Summary Judgment because questions of material fact exist as to:
 {¶ 9} "(A) Whether Appellants were explained the conditions of the insurance policies, were directed to read the eligibility requirements, or were told that they may not qualify for such insurance coverage by KLABEN, by and through its employees;
 {¶ 10} "(B) Whether KLABEN, by and through its employees, conducted insurance activities which required an insurance license in the State of Ohio, including receipt of commissions on the sale of insurance products and engaging in active communications regarding insurance products with potential buyers;
 {¶ 11} "(C) Whether or not any licensed insurance agency or agent directed the clerical activities of KLABEN'S employees regarding the sale of insurance products to Appellants; and
 {¶ 12} "(D) Whether KLABEN and its employees engaged in insurance activities requiring a license, so as to be held to professional standards of care."
 {¶ 13} Pursuant to Civ.R. 56, summary judgment is proper where: (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party. A party seeking summary judgment must point specifically to some evidence that affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims.[1] In response, the nonmoving party must set forth specific facts that demonstrate that there is a genuine factual issue to be tried. He or she may not rest on conclusory statements or the bare allegations of the complaint.[2]
 {¶ 14} "Due to the fact that summary judgment is designed to cut short the litigation process, trial courts should award such with caution, resolving doubts and construing evidence in favor of the nonmoving party. * * * In that a grant of summary judgment disposes of a case as a matter of law, this court's analysis on appeal is conducted under a de novo standard of review."[3]
 {¶ 15} The offering of credit disability insurance in the state of Ohio is governed by R.C. 3918.01 to 3918.13, and Ohio Adm. Code 3901-1-14.
 {¶ 16} Under R.C. 3918.01, "[a]ll consumer credit insurance issued or sold in connection with loans or other credit transactions for personal, family, or household purposes is subject" to the sections of the Ohio Revised Code just cited, with exceptions not here relevant.
 {¶ 17} The applicable provisions of the Ohio Administrative Code governing disclosures to be made in connection with the issuance of credit accident and health insurance policies are as follows:
 {¶ 18} "(B) Filing and approval, disclosure
 {¶ 19} "* * *
 {¶ 20} "(3) Division (D) of section 3918.06 of the Revised Code provides that the copy of the application for, or notice of, proposed insurance shall be separate and apart from the credit instrument unless the information required `is prominently set forth therein.' * * *
 {¶ 21} "(4)(a) The disclosure required by paragraph (B)(3) of this rule shall be made to the debtor at the time of the debtor's application for credit life or credit accident and health insurance (excluding non-contributory insurance) in connection with a credit transaction, and before the debtor becomes obligated to purchase such insurance. * * *
 {¶ 22} "(c) Additional disclosure shall be made using the exact form set forth in `Appendix I.'"[4]
 {¶ 23} The form referred to in Ohio Adm. Code3901-1-14(B)(4)(c) is entitled "Optional Credit Insurance." The form used in the Parker and Konopinski transactions is a mirror image of the form set forth in the administrative code and, therefore, conforms to the "exact form" requirement of that regulation.
 {¶ 24} During discovery, Konopinski provided a response to request for admission number 21, requesting him to admit that the only representations made to him by Protective regarding the terms and conditions of his certificate of insurance were those set forth on the disability insurance certificate and the disclosure form entitled "Optional Credit Insurance." His response was as follows:
 {¶ 25} "Deny. I was told by the salesman and loan/finance person that I could purchase disability coverage on my lease if I wanted to pay for it. The loan person who gave me the paperwork to sign never told me that there were any conditions for disability coverage. I was never asked any questions. I was never told that if I had certain medical conditions that I could not buy the coverage. I was never told to read any of the paperwork to make sure I qualified. I was sold coverage and was told that I could buy it. All statements were made to me for the sole purpose of selling Protective's policy, and I believed that the salesman and loan finance person were allowed to sell it to me for Protective."
 {¶ 26} In answer to the same request for admission, Parker responded almost verbatim to Konopinski's response, except that he added, "nor was I screened in any way for eligibility."
 {¶ 27} In deposition, James Walsh, the president of J.F. Walsh Insurance Agency, testified that his agency had no relationship with Klaben Dodge. Instead, testified Walsh, his agency's relationship was with Chapel Hill Insurance Agency ("Chapel Hill"), an insurance agency owned by Klaben. Walsh further testified that it was his understanding that Chapel Hill was the entity that offered credit disability policies to customers, and that the finance manager who dealt with the credit disability policies at Klaben was an employee of Chapel Hill.
 {¶ 28} While the record does reflect that Chapel Hill was licensed in 1987 to sell credit disability insurance in the state of Ohio, there is no other support in the record for Walsh's assertion that Chapel Hill was the agency that sold the credit disability coverage to Parker and Konopinski. In fact, Karl Lunghofer, who was the finance manager who sold the credit disability coverage to Parker and Konopinski, testified in deposition that he had never heard of Chapel Hill and that his commission checks for sales of disability coverage were issued by Klaben. Moreover, the application for the group policy of insurance was executed by Klaben, not by Chapel Hill; and the group master policy was issued to Klaben, not to Chapel Hill. This relationship between Klaben and Protective is further borne out by the testimony of the office manager, who testified that Klaben would receive a check for the full disability insurance premium from the bank doing the vehicle financing in respect of the disability coverage that was sold. Klaben would keep fifty-five percent of the premium and forward a check for the remaining forty-five percent to Protective. The finance manager who sold the coverage would receive a commission from Klaben equal to six percent of eighty percent of the portion retained by Klaben. If, for some reason, the credit disability coverage was cancelled, Protective would send a check to the bank and charge back Klaben for the unearned commission.
 {¶ 29} In the case of Parker and Konopinski, they applied for disability coverage in April 2000. The application for insurance was printed on a form prepared by Protective and was identical for both individuals. The application is divided into three sections: "Schedule," "Warning — You must be eligible to apply for insurance," and "Application."
 {¶ 30} In the "Schedule" section of the form, there are boxes one may check for various kinds of coverages. Parker and Konopinski designated in the schedule section that they wished to purchase disability insurance.
 {¶ 31} In the "Warning" section, the applicant is warned that he/she must be eligible to apply for insurance. The eligibility requirements are four in number: the applicant may not be sixty-six years of age on the effective date of the insurance, nor sixty-nine years of age as of the expiration date of the insurance; the applicant must be the named insured or co-insured, and must have had active employment of at least thirty hours in the four weeks prior to the effective date; the amount of the vehicle loan may not exceed the policy maximums listed on the form; and the applicant is not eligible for involuntary unemployment insurance unless he/she has been an active employee for the previous twelve months. Parker and Konopinski met all the eligibility requirements.
 {¶ 32} The pertinent parts of the "Application" section of the form are as follows:
 {¶ 33} "1. I am not insurable for any insurance other than Involuntary Unemployment if I now have, or during the past two (2) years, have been seen, diagnosed or treated for: (a) A condition, disease or disorder of the brain, heart, lung(s), liver, kidney(s), nervous system or circulatory system; or (b) Tumor; Cancer; Uncontrolled High Blood Pressure; Diabetes; Alcoholism; Drug Abuse; Emotional Disorder; Mental Illness; Acquired Immune Deficiency Syndrome (AIDS), the Aids Related Complex (ARC); or received test results showing evidence of antibodies of the AIDS virus (HIV Positive).
 {¶ 34} "2. I am not insurable for disability insurance if I now have, or during the past two (2) years, have been seen, diagnosed or treated for a condition, disease or disorder of the joints, neck, back, or knees.
 {¶ 35} "* * *
 {¶ 36} "The sales representative is not authorized to waive or change any of the insurability requirements of this Application or any provision, including eligibility, of the Certificate.
 {¶ 37} "I have read and understand the Application and represent that I am insurable for the coverage as requested in the Schedule [i.e. disability insurance]. I understand this insurance is not required to obtain credit. I understand and agree that I am insured only if I have signed below and I agree to pay the additional cost of the insurance. I have detached and retained the `INSURED'S COPY' of this form and Certificate for my records."
 {¶ 38} Certificates of insurance were issued to Parker and Konopinski. The section of the certificate pertaining to total disability insurance with the subheading "who is eligible" provides as follows:
 {¶ 39} "You are only eligible to apply for Disability Insurance if you:
 {¶ 40} "1. have not attained age 66 as of the Effective Date.
 {¶ 41} "2. will not attain age 69 as of the Expiration Date of the insurance.
 {¶ 42} "3. are the named Debtor or Co-Debtor as shown in the Schedule.
 {¶ 43} "4. have been actively at work, in full performance of all of the duties of your regular occupation, for an employer for salary or wages, at a location other than a residence, for at least 30 hours per week for the 4 weeks prior to, and on the Effective Date."
 {¶ 44} As stated above, Parker and Konopinski satisfied all of these eligibility requirements.
 {¶ 45} Under the subheading on the certificate entitled "what we will not pay," Protective says that "[w]e won't pay the claim or refund the premium if your disability was a result of * * * (6) a pre-existing condition." A pre-existing condition is defined as follows:
 {¶ 46} "[A]n illness, disease or physical condition for which you received medical advice, diagnosis or treatment both within the 6 months before and the 6 months after the Effective Date as shown in the Schedule. However, if your condition did not cause total disability within the 6 months following the Effective Date, that condition will be covered."
 {¶ 47} Finally, the subheading entitled "entire contract" states that "[t]he Group Policy, the Application for the Group Policy, all Riders, Addenda or Endorsements to the Group Policy, the Schedule, the Warning/Application, this Certificate and/or any Riders or Endorsements to the Certificate constitute the entire contract of insurance."
 {¶ 48} Parker or Konopinski did not receive individual policies of disability insurance. The Ohio statute merely requires that the insured receive a certificate of insurance.[5]
 {¶ 49} The first prong of Parker's and Konopinski's first assignment of error is premised on the notion that Klaben and/or Protective had a duty to ask questions about their medical conditions, to ferret out reasons why the coverage might not be available, and to make sure these applicants for credit accident and health insurance read their applications to satisfy themselves that they were eligible for this type of insurance.
 {¶ 50} A review of the statutory provisions and the regulations from the Ohio Administrative Code warrants no such conclusion. Nowhere in the statutes or the regulations is there an express duty cast upon the salesperson or the finance manager to ask questions about the applicant's medical condition, to discover reasons why coverage might not be available, or to make sure that the applicant reads the relevant paperwork to satisfy himself that he is eligible for the insurance coverage.
 {¶ 51} Further, the judicial decisions cited by Parker and Konopinski for the proposition that such a duty exists are inapposite. Those cases stand for the proposition that, in a bank-borrower relationship, where the bank has elicited from the borrower his intention to procure mortgage insurance, the bank has a duty to tell the borrower that he must procure it himself;[6] or that, because of the "bank's superior conversance with the area of loan processing,"[7] a bank has a duty to "counsel a loan applicant as to how to secure mortgage insurance."[8] Further, this court's holding in the case of Union Savings Trust Co. v. Bland, which dealt with an application for credit disability insurance, was based on the fact that the salesperson knew the applicant was disabled, and applied for the insurance nevertheless.[9] This element of knowledge of the applicant's disability is lacking in this case.
 {¶ 52} In Parker's case, his lease transaction took place on April 24, 2000. One month prior, his doctor had ordered x-rays of his left hip; and within two months of the lease transaction, he had a total hip replacement of his left hip. The hip replacement gave rise to his claim for disability. Significantly, four days prior to the lease transaction, his doctor noted in his chart: "[h]owever, one complicating factor is his insurance is due to expire within the next month, and the patient would like to have the procedure done prior to this expiration." Though the reference to insurance by his doctor refers to hospitalization insurance, it is clear that Parker, the doctor's patient, was very much aware of the effective date of his insurance coverage. Four days later, when he went into the Klaben showroom to lease a truck and was handed a form entitled "optional credit insurance," it is reasonable to assume that Parker knew the insurance company offering the credit insurance coverage would do so only upon certain terms and conditions, that those terms and conditions would be restrictive in nature, and that his extant medical condition might be impacted by those terms and conditions. The fact that he was told that all he had to do was sign the form and he would be covered; the fact that he was not told to read the applicable paperwork; and the fact that he did not read any of the paperwork do not belie the fact that Parker was aware of his own medical condition and took no affirmative measures to determine if credit insurance coverage might be affected by such medical condition. None of the special circumstances found in theStone, Walters, or Bland cases were present in Parker's fact situation. He had not specifically requested disability insurance, the salesperson and finance manager were not made aware of his medical condition, he did not have previous transactions with Klaben that may have put it on notice of anything unusual, and it was not a required part of the transaction. His case does not fall within the holdings of the cited cases that hold that a duty exists to counsel the customer as to the specifics of what he is signing. Moreover, theWinnick case, decided by the Court of Appeals of Michigan, is inapposite because the customer in that case successfully defeated an insurance company's motion for summary determination, because a genuine issue of material fact remained as to whether the customer had been given a copy of the insurance policy, a specific requirement of Michigan law.[10] This was not Parker's fact situation.
 {¶ 53} In Konopinski's case, his lease transaction with Klaben was entered into on April 6, 2000. Within the previous six weeks, he had a heart catherization and a balloon angioplasty performed; and approximately three months after the lease transaction, he had a triple bypass of his coronary arteries. On his claim form for disability, he stated that the onset of the disability occurred on June 19, 2000. Just as in the Parker situation, Konopinski was aware of his own medical condition on April 6, 2000, when he executed the lease papers. He also could have anticipated that his medical condition would be impacted by the terms and conditions of the disability insurance policy. The fact that he was told that coverage would be in effect immediately; that all he had to do was sign the forms; and that he did not read the forms in question does not change the fact that he had a serious medical condition of which he was aware. Just as with Parker, Konopinski did nothing affirmative to ascertain if he might still be covered by credit disability coverage notwithstanding his coronary condition.
 {¶ 54} Parker's and Konopinski's fact situations are more akin to the case of Collins v. Gen. Motors Acceptance Corp., in which the buyer of an automobile bought a credit disability policy, but failed to read the exclusionary language pertaining to pre-existing conditions. In appealing the entry of summary judgment against him, the buyer argued that the dealer's failure to disclose the pre-existing condition clause violated tort and contract principles and presented a question of fact. The Tenth Appellate District affirmed the judgment entry of the trial court, and held that "[t]he fact that [the salesperson] told plaintiffs that they were `covered' did not entitle plaintiffs to assume that they were covered for any and all risks under any circumstances."[11] The court analyzed the issue presented by the buyer thusly: "[r]educed to its essentials, plaintiffs' argument is that defendants should have disclosed or advised them concerning the exclusion in question and that defendants' failure to do this caused them harm. We disagree."[12]
 {¶ 55} In another case, the First Appellate District held the dealership had not prevented the customer from reading the loan agreement prior to signing it, and that the customer could have observed that the agreement contained terms that varied from representations made by personnel of the dealership in the negotiations that led her to purchase.[13] Thus, without more facts and circumstances to support a duty on the part of Klaben to counsel Parker and Konopinski with respect to their pre-existing conditions, we decline to find such a duty. Nor do we perceive the existence of a fiduciary duty, and we adhere to the general principle that "[t]he relationship of debtor and creditor, without more, is not a fiduciary relationship."[14]
 {¶ 56} Parker and Konopinski argue that "they were each led to believe that they were guaranteed disability coverage on their loans; that the finance manager represented that they could secure disability coverage if they paid for it, and that he never alerted them to the health provisions"; and that they "were each led to believe that they were covered by the disability insurance sold to them and included in their loans." These allegations sound in fraudulent inducement, a claim asserting that "a misrepresentation of facts outside the contract or other wrongful conduct induced a party to enter into the contract."[15]
 {¶ 57} In the case of ABM Farms v. Woods, the Supreme Court of Ohio, with a similar fact pattern, stated with respect to the claim of Woods:
 {¶ 58} "At the center of Woods's allegation of fraudulent inducement is the naked truth that she did not read the contract. It drives a stake into the heart of her claim. `A person of ordinary mind cannot be heard to say that he was misled into signing a paper which was different from what he intended, when he could have known the truth by merely looking when he signed.'[16] * * * `It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written.'"[17], [18]
 {¶ 59} We find that there is no evidence of fraudulent inducement regarding the execution by Parker and Konopinski of documents pertaining to credit accident and health insurance.
 {¶ 60} In the second prong of their first assignment of error, Parker and Konopinski have also argued that Klaben and Protective were not in compliance with Ohio laws governing the issuance and sale of credit accident and health insurance policies. Though not alleged in their complaint, they now argue in this appeal that lack of compliance with various Ohio statutes governing the issuance of insurance policies provides a basis for liability against Klaben and Protective. We decline to pass on these arguments, because they are in furtherance of a private right of action. No such private right of action has been conferred upon Parker and Konopinski to pursue alleged violations of Ohio insurance laws.
 {¶ 61} "The Supreme Court of Ohio has held that where an agency is charged with enforcement of certain laws, these laws do not confer upon an individual the right to bring a private civil action absent a `clear implication' that such a remedy was intended by the legislature."[19]
 {¶ 62} The third prong of the first assignment of error posits that genuine issues of material fact exist as to whether any licensed insurance agency directed the clerical activities of Klaben's employees regarding the sale of insurance products to Parker and Konopinski. This argument goes to whether Klaben is exempt from the requirements of R.C. 3905.01(D), which provides that a person who sells insurance in Ohio must be licensed by the superintendent of insurance. In this respect, the argument is a corollary of the second prong of the first assignment of error, where we said that individuals are not afforded a private right of action to make sure that car dealers are in compliance with Ohio insurance laws. For the reasons indicated above, we decline an analysis of this prong of the first assignment of error.
 {¶ 63} The fourth and final prong of the first assignment of error argues that genuine issues of material fact exist as to whether Klaben engaged in insurance activities, albeit without a license, so as to be held to professional standards of care. In order words, Parker and Konopinski argue that Klaben was negligent in the sale of the disability insurance product to them, because the act of doing so did not measure up to the standard of care expected of insurance agents selling such products.
 {¶ 64} Klaben is licensed as a new motor vehicle dealer pursuant to the provisions of R.C. 4517.01 through 4517.45. From the record before us, it is also clear that Klaben is in the business of selling insurance, albeit without a license. Its employees were encouraged to "offer" disability insurance to its customers, for which Klaben and the employees received commissions. Its administrative staff was equipped to deal with Protective, the insurer of the disability coverage in question, and it regularly forwarded premiums to Protective, after deducting Klaben's commission. The master group policy enabling Klaben to sell disability insurance was issued in Klaben's name. Except for putting a sign in the front of the dealership denominating it as "Klaben Insurance Agency," it had all the attributes of a de facto insurance agency.
 {¶ 65} As an insurance agency, Klaben had a duty to exercise good faith and reasonable diligence to its customers:
 {¶ 66} "Under Ohio law, an insurance agency has a duty to exercise good faith and reasonable diligence in providing insurance requested by its customer. * * * An agent will be held liable if `as a result of his or her negligent failure to perform that obligation (to procure insurance), the other party to the (insurance) contract suffers a loss because of a want of insurance coverage contemplated by the agent's undertaking.'"[20]
 {¶ 67} We conclude that genuine issues of material fact exist as to whether Klaben exercised good faith and reasonable diligence toward Parker and Konopinski in their efforts to apply for and obtain disability insurance coverage. Whether or not Parker and Konopinski read the application form and/or the certificate of insurance, there are factual questions as to whether the Klaben employees tried to sell them insurance for which they were not insurable. Had the Klaben employee who offered the insurance made a minimum good faith effort, and had he exercised the slightest amount of reasonable diligence, Parker and Konopinski would not be in court, because it would have been manifest to them that they should not have applied for the disability insurance due to their pre-existing conditions. However, having applied, and having been told that all they had to do was pay the premium and they would be covered, according to their version, it is clear that the Klaben employee did little or nothing to make sure these customers were eligible for the insurance they paid for. In failing to make that effort, this matter needs to return to the trial court to determine whether the duty of care owed to Parker and Konopinski was violated.
 {¶ 68} The first assignment of error is with merit.
 {¶ 69} The second assignment of error is as follows:
 {¶ 70} "The Trial Court erred in granting Defendant-Appellee PROTECTIVE'S Motion for Summary Judgment because questions of material fact exist as to:
 {¶ 71} "(A) Whether there was an agency relationship between KLABEN DODGE and PROTECTIVE LIFE INSURANCE COMPANY OF OHIO, INC. so as to impute to PROTECTIVE the actions of KLABEN and its employees surrounding sales of PROTECTIVE insurance products."
 {¶ 72} An agent may bind his principal, provided the agent is acting within the scope of his actual authority.[21] Actual authority can be granted to an agent either by means of express terms from the principal, or by implication, and the implied grant will embrace that which is reasonably necessary to carry into effect the express grant of authority.[22] Likewise, an agent can bind a principal under the doctrine of apparent authority where the principal holds the agent out to the public as having authority to act, and third parties reasonably believe the agent does have authority to act.[23]
 {¶ 73} To support their agency theory, Parker and Konopinski rely on this court's decision in Union Savings Trust Co. v.Bland, where this court found that a genuine issue of material fact existed with respect to whether an agency relationship existed between the auto dealership and the insurance company, such that the dealership's knowledge of the disability could be imputed to the insurance company.[24] Their reliance on theBland case is misplaced, however. There is nothing in the record to support the notion that any person employed by Klaben had any knowledge of the pre-existing conditions of Parker or Konopinski. Lacking such knowledge, there is nothing to impute to the insurance company.
 {¶ 74} We choose instead to base the agency relationship between Protective and Klaben on the master group policy issued by Protective to Klaben on February 1, 1998. It was pursuant to that group policy that Klaben undertook to sell credit disability insurance to Parker and Konopinski. Protective had an ongoing relationship with Klaben at least back to that date. Protective received remittances of premium payments in respect of disability insurance coverage from Klaben on a monthly basis. The forms used by Klaben were promulgated by Protective. For all intents and purposes, Klaben was an insurance agency, and Protective was the insurer. The agency relationship is manifest.
 {¶ 75} Moreover, we find that an ambiguity exists in Protective's form employed by Klaben to sign up new customers for disability insurance.
 {¶ 76} In the "Application" section of the form, the insured makes a representation that "I am insurable for the coverage as requested in the Schedule [i.e. disability insurance]." Also in the "Application" section, there is a recitation that "I am not insurable" if there has been diagnosis or treatment for specified medical conditions. These are not mutually exclusive statements or representations, appearing as they do in the same section of the form. On the one hand, Parker and Konopinski were not making misrepresentations of fact when they said "I am not insurable," because Klaben and Protective would argue that their pre-existing conditions prevented them from obtaining insurance. On the other hand, to represent that "I am insurable" is merely consistent with our finding Klaben to be an insurance agency exercising a duty of good faith and reasonable diligence toward its customers in selling them a product they actually paid for. However, if the trier of fact determines that Klaben was not exercising its duty of good faith and reasonable diligence towards its customers, then the statement "I am insurable" serves to reinforce the conclusion that Klaben violated such a duty by selling a product that the customers had no business buying. That is, they may be insurable, but they are not covered in case of a disability, which was the sole purpose for obtaining the coverage and paying the premium for that coverage. There does not appear to be any other way to reconcile the two representations in the application. We therefore find that genuine issues of material fact exist as to whether Protective, as principal for its agent, Klaben, is liable for negligent acts committed by Klaben.
 {¶ 77} The second assignment of error is with merit.
 {¶ 78} For the reasons indicated, the judgment entries of the trial court are reversed, and the causes are remanded for further proceedings consistent with this opinion.
O'Toole, J., concurs.
Grendell, J., dissents with Dissenting Opinion.
[1] Dresher v. Burt (1996), 75 Ohio St.3d 280, 292.
[2] Smith v. L.J. Lewis Ent., Inc., d.b.a. Action EmergencyAmbulance (Sept. 28, 2001), 11th Dist. No. 2000-T-0052, 2001 Ohio App. LEXIS 4413, at *12-14.
[3] (Citations omitted.) El-Hakim v. Am. Gen. Life and Acc.Co. (Aug. 20, 1999), 7th Dist. No. 97 CA 6, 1999 Ohio App. LEXIS 3920, at *7.
[4] Ohio Adm. Code 3901-1-14.
[5] R.C. 3918.06(A).
[6] Stone v. Davis (1981), 66 Ohio St.2d 74, 78-79.
[7] Walters v. First National Bank of Newark (1982),69 Ohio St.2d 677, 679.
[8] Id.
[9] Union Savings Trust Co. v. Bland (June 15, 1984), 11th Dist. No. 3281, 1984 Ohio App. LEXIS 10045, at *3-4.
[10] Winnick v. N. Am. Ins. Co. (Nov. 5, 1996), Mich. Ct. of Appeals No. 178689, 1996 Mich. App. LEXIS 844, at *3-4.
[11] Collins v. General Motors Acceptance Corp. (June 4, 1991), 10th Dist. No. 91AP-124, 1991 Ohio App. LEXIS 2677, at *10.
[12] Id. at *12.
[13] Burns v. Beechmont Chevrolet, Inc., 1st Dist. No. C-020772, 2004-Ohio-4667, at ¶ 8.
[14] Umbaugh Pole Bldg. Co. v. Scott (1979),58 Ohio St.2d 282, paragraph one of the syllabus.
[15] ABM Farms, Inc. v. Woods (1998), 81 Ohio St.3d 498,503.
[16] McAdams v. McAdams (1909), 80 Ohio St. 232, 240-241.
[17] Upton v. Tribilcock (1875), 91 U.S. 45, 50.
[18] ABM Farms, Inc. v. Woods, 81 Ohio St.3d at 503.
[19] W. Res. Care Sys. v. Masters (Sept. 28, 1999), 7th Dist. Nos. 97 CA 95 and 97 CA 104, 1999 Ohio App. LEXIS 4695, at *7, citing Fawcett v. G.C. Murphy Co. (1976), 46 Ohio St.2d 245,248-249.
[20] (Citations omitted.) Gallenstein Bros. Inc. v. Gen. Acc.Ins. Co. (S.D. Ohio 2001), 178 F.Supp.2d 907, 919. See, also,Rose v. Landen, 12th Dist. No. CA2004-06-066, 2005-Ohio-1623, ¶15-16.
[21] Damon's Missouri, Inc. v. Davis (1992),63 Ohio St.3d 605, 608.
[22] Id., citing Spengler v. Sonneberg (1913),88 Ohio St. 192, 200-201.
[23] Master Consolidated Corp. v. BancOhio Natl. Bank (1991),61 Ohio St.3d 570, 576-577.
[24] Union Savings Trust Co. v. Bland, 1984 Ohio App. LEXIS 10045, at *3-4.